**RECEIVED**

DEC - 5 2016

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

LINDA BELLARD                                    CIVIL ACTION NO. 15-0428

VERSUS                                           JUDGE DOHERTY

UNUM LIFE INSURANCE CO.                          MAGISTRATE JUDGE WHITEHURST
OF AMERICA

## RULING

Plaintiff Linda Bellard brings this suit against Unum Life Insurance Company of America

("Unum"), alleging she was denied long term disability benefits in violation of provisions of the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. Pursuant to her

suit, plaintiff seeks: "a finding by this Court that she is disabled pursuant to the Unum . . . policy[,]

. . . payment of past due benefits, continued monthly disability, future long term disability benefits,

double payment of benefits, plus reasonable attorney fees . . . ." [Doc. 1-1, p. 4 (emphasis omitted)]

The parties have filed a stipulated administrative record [Doc. 14] and have submitted this matter

to the Court for trial on the briefs. [Doc. 17; Doc. 19] Pursuant to Fed. R. Civ. P. 52(a), this Ruling

constitutes the Court's findings of fact and conclusions of law. For the reasons which follow, the

decision denying plaintiff's claim for long term disability benefits is AFFIRMED.

## I.     Factual and Procedural Background

Plaintiff worked as a PBX operator (*i.e.* telephone operator) at Opelousas General Hospital

for over fourteen years. She last worked on September 6, 2013. [Doc. 12, p. 47] At that time,

plaintiff was sixty-three years of age. At the end of September 2013, plaintiff applied for long term

disability benefits, contending she could no longer work due to transient ischemic attacks ("TIA"),

rheumatoid arthritis, diabetes mellitus and "heart problems." [Id. at 61] In her application, in

response to a question asking which specific duties of plaintiff's occupation she was unable to perform due to her medical condition, plaintiff responded: "Rhumdoid [sic] [arthritis] - hard to sit for long peroids [sic] because of swelling and Pain, job causes stress and brings on TIAs." [Id. at 62] Plaintiff additionally reported she was treated for a heart attack in 1983, and she sought treatment for a TIA on August 25, 2013. [Id. at 61] She made no mention of a diagnosis of depression, or of an inability to control urine due to reliance on diuretics.

In connection with plaintiff's disability application, her physician of fifteen years, Dr. Gary Blanchard (Internist), submitted an "Attending Physician Statement." [Doc. 17, p. 1; Doc. 19, p. 6] In that document, Dr. Blanchard stated the conditions preventing plaintiff from performing her job duties were: "TIA, Rheumatoid Arthritis and Diabetes Mellitus." [Doc. 12, p. 55] He listed her symptoms as weakness, numbness, and loss of muscle function on the right side. He estimated plaintiff could sit "Frequently 34-66%", and stand and walk "Occasionally 1-33%." [Id. at 56] Dr. Blanchard estimated plaintiff could perform fine finger movements and hand/eye coordinated movements (right side) "Occasionally 1-33%," and the same functions on the left side "Frequently 34-66%." He listed her dominant hand as the right hand. [Id.] In response to a question about plaintiff's restrictions ("activities the patient should not do") and limitations ("activities the patient cannot do"), Dr. Blanchard replied to both questions as follows: "Patient unable to perform all job duties." [Id. at 57] Dr. Blanchard listed all of plaintiff's medications, but made no statement regarding the impact of the medications on plaintiff's ability to work. Like Ms. Bellard, Dr. Blanchard made no mention of a diagnosis of depression, or of an inability to control urine due to reliance on diuretics. [Id.] In response to a question asking whether there are "any cognitive deficits or psychiatric conditions that impact function," Dr. Blanchard checked "no." [Id. at 55]

On March 7, 2014, Unum conducted an initial telephone interview with Ms. Bellard. [Doc. 19, p. 7; Doc. 12, p. 158] According to the notes of that interview, when asked what about her condition had changed causing her to be unable to work, plaintiff responded: she had swelling in her hands and feet; she had experienced several episodes which she identified as seizures, but the hospital where she was treated identified as "small strokes"; on October 25, 2013, she was seen by Dr. Foreman, a neurologist, who advised plaintiff she was having neither seizures nor strokes, and diagnosed her with a DNA deficiency disease called Paroxysnel Nonkinesigenic Dystonia (PND)[1] and prescribed medication. Plaintiff advised Unum she had not had any "seizures" since starting the medication prescribed by Dr. Foreman. She further advised that although Dr. Foreman had not restricted her from driving, she did not trust herself to drive. Plaintiff identified her current symptoms as pain and swelling in her joints due to rheumatoid arthritis, but stated her "seizures" were under control. [Doc. 12, pp. 158-59] Plaintiff described her job duties as working at the front desk and taking phone calls. She stated she experienced pain from the constant sitting and use of a computer. [Id. at 160] Regarding her physical activities, plaintiff stated she did light housework, dishes, laundry and cooking. She would grocery shop with her husband, and she could walk about a half mile at the park before needing to sit. [Id.] Ms. Bellard made no mention of issues with incontinence due to her use of diuretics.

Thereafter, Unum received and began review of plaintiff's medical records. According to the records of Dr. Foreman, plaintiff's neurologist, he first treated plaintiff on October 25, 2013 (*i.e.*, after plaintiff's submission of her disability application). At plaintiff's first visit, Dr. Foreman ruled

---

[1]According to the administrative record, PND is not a seizure disorder, but rather a movement disorder. [Doc. 12, p. 567] It consists of sudden attacks of involuntary movements with preserved consciousness, often preceded by an aura. The attacks are usually unilateral and can be provoked with certain movements or hyperventilation. The episodes usually last less than one minute. The disorder is generally responsive to anticonvulsant medication. [Id.]

out TIA and seizure disorder and diagnosed plaintiff with PND, for which he prescribed medication. [Id. at 241-42] At a follow up visit on December 5, 2013, plaintiff denied any seizure activity. [Id. at 239]

A review of Dr. Blanchard's records showed Dr. Blanchard saw plaintiff three days before she discontinued working. The reasons for the appointment were stated as: trouble controlling blood sugar; TIA previous Sunday; stays jittery and anxious since TIA. [Id. at 270] Dr. Blanchard's office notes make no mention of a plaintiff's inability to perform her job duties due to incontinence, nor any restrictions on driving. Dr. Blanchard's office notes dated December 10, 2013 acknowledge Dr. Foreman's diagnosis of PND, which Dr. Blanchard described as "considered to be a seizure disorder." [Id. at 268] The records from both visits state "Diabetes mellitus without mention of complication, type II or unspecified type, not stated as uncontrolled." [Id. at 268, 270]

According to the records of plaintiff's rheumatologist, Dr. Jennifer Malin, plaintiff's joint examinations were normal, her joints typically were not warm or swollen, and no synovitis was noted. [Id. at pp. 328, 331, 334] Additionally, "no edema, no vasospasm noted." [Id. at 334] No psychological issues were noted. [Id.] On November 6, 2013, Dr. Malin noted osteoarthritic changes. [Id. at 334] Dr. Malin stated plaintiff was "doing great on Enbrel." [Id. at 335] There is no mention of any work restrictions or limitations.

After review of plaintiff's medical records, Unum contacted all of plaintiff's medical providers to verify whether or not they were placing any work restrictions or limitations on plaintiff. Dr. Malin advised she was not. [Id. at 190] Dr. Foreman responded via written correspondence that he had not assessed any work restrictions, because plaintiff told him she was retired. He added if plaintiff's work capacity needed to be addressed, "I recommend a formal functional capacity

evaluation, which I do not perform."[2] [Id. at 299] Dr. Blanchard advised plaintiff was unable to drive

or work due to seizures. [Id. at 346]

On May 29, 2014, Unum's vocational consultant, Jessica Spencer, completed a vocational

analysis with regard to plaintiff. Ms. Spencer concluded plaintiff's occupation in the national

economy was consistent with the duties of a PBX operator based on the DOC occupational code,

which she set forth as follows:

> Operates switchboard equipment to relay incoming, outgoing, and interoffice calls.
> May supply information to callers and take messages or direct to voice mail.
> Interrupts busy lines if an emergency warrants interruption. Assists individuals in
> making telephone calls. Assists individuals having difficulties with automated phone
> systems. May maintain organization's phone directory. May perform clerical duties,
> such as word processing, proofreading, and sorting mail. May operate paging system
> to call individuals in establishment to phone.

[Id. at 371] Ms. Spencer noted the physical/cognitive/mental stress demands of the job as: "Exertion

up to 10 Lbs. occasionally. Mostly sitting, may involve standing or walking for brief periods of time.

Constant handling, talking, and hearing. Frequent reaching, fingering, near acuity, and visual

accommodation." [Id.]

Unum then had plaintiff's medical records reviewed by Dr. Stephen Leverett, Board Certified

in Family Medicine, to determine whether plaintiff could perform her prior occupation. [Id. at 402;

Doc. 19, p. 10] During the course of his review, Dr. Leverett contacted Dr. Blanchard to gain a better

understanding of his opinion. [Doc. 12, p. 402] Dr. Blanchard advised Dr. Leverett that plaintiff was

not driving because of her "seizure disorder." [Id.] He stated because plaintiff has to stay primarily

seated for her job, it was difficult for her to get up and go to the bathroom. [Id.] Dr. Blanchard

---

[2]Unum later attempted to contact Dr. Foreman by telephone on four occasions to clarify whether
he was "opining any r&l's [*i.e.*, restrictions and limitations] at all" and whether he was "advising Unum
to perform an FBE for ee or just recommending this." None of the calls were returned.  [Doc. 12, pp.
418-20, 430]

acknowledged plaintiff's arthritis was fairly well controlled by medication, but noted she occasionally must take hydrocodone in addition to her regular medication, which she could not take while working. Dr. Blanchard additionally stated plaintiff's mental health conditions (depression and anxiety) contributed to her inability to work, and he did not think plaintiff would ever be able to return to work in any capacity. [Id. at 402, 405]

In Dr. Leverett's report, he noted plaintiff had been diagnosed with PND, which he described as "a rare disorder characterized by spontaneous episodes of dystonia that may last minutes to hours, and recur 1-3 times a month." [Id. at 404] In plaintiff's case, "the episodes were characterized by right UE [upper extremity] and LE [lower extremity] contractures lasting 1-2 minutes, occurring every 3-4 months with occasional fall with no injury, with no loss of consciousness or post ictal residual symptoms." [Id.] He noted plaintiff reported no recurrent episodes since beginning her medication regimen, and plaintiff reported no significant adverse side effects from the medication. With regard to her rheumatoid arthritis, Dr. Leverett concluded from the medical records that there were "some expected mild changes in joint gross morphology but without findings of significant joint deformity and normal joint range of motion." [Id. at 405] Dr. Leverett noted plaintiff's medication provided good relief of her arthritic symptoms. [Id. at 405]

Dr. Leverett additionally noted plaintiff engaged in a number of household and community activities without apparent loss of function or sustainability. [Id. at 404] While plaintiff opted not to drive, she had not been restricted from doing so by Dr. Foreman. Dr. Leverett further noted driving is not material to plaintiff's occupational demands. Dr. Leverett found no reports of incontinence associated with plaintiff's diuretic use. He found no reported adverse medication effects associated with plaintiff's occasional hydrocodone use. He noted plaintiff had only recently begun taking medication for her depression, which he characterized as mild in light of the fact she had not

been referred to a specialist for treatment. [Id. at 405] Dr. Leverett acknowledged plaintiff reported she could not "sit and answer phones," but concluded "this self-assessment is not supported by the minimal findings on examination." [Id.]

Dr. Leverett ultimately concluded there was "no condition or combination of conditions that would reasonably preclude the Insured from being able to perform occasional exertion of up to 10 pounds of force; mostly sitting; brief periods of standing and walking; constant handling, talking, hearing; frequent fingering. . . ." [Id.] Dr. Leverett further concluded, "Dr. Blanchard's opinion is not well supported by medically acceptable clinical standards, laboratory or diagnostic techniques and is inconsistent with the other substantial evidence in the file." [Id. at 406]

Because Dr. Leverett disagreed with the opinion of Dr. Blanchard, Unum had plaintiff's case reviewed by a second physician, Dr. Bress, a Board Certified Internist. [Id. at 408; Doc. 19, p. 13] Dr. Bress agreed with Dr. Leverett that the records did not support a finding that plaintiff could not perform the duties of her occupation. [Doc. 12, p. 411] He noted plaintiff reported she could do light housework, dishes, laundry and cooking. She reported she would grocery shop with her husband and walk in the park. She could walk a half mile before needing to sit. In Dr. Bress' opinion, "This is much more exertion that [sic] would be required of any sedentary occ." [Id. at 411] He further noted no physician had restricted plaintiff from driving, there were no reports of urinary problems in the records, and no reports of adverse side effects from pain medication which would impact plaintiff's work capacity. [Id.]

On May 19, 2014, Unum sent plaintiff a detailed letter, advising that her claim for disability benefits had been denied. Unum stated it had determined plaintiff was able to perform the duties of her occupation, and set forth the reasons for its decision. [Id. at 423-24] In the letter, Unum noted neither plaintiff's rheumatologist nor neurologist had placed any restrictions or limitations upon her

activities. Dr. Foreman's notes from plaintiff's most recent appointment reflect plaintiff's PND was

well controlled with medication, and that plaintiff denied any further seizure activity. Dr. Blanchard

confirmed plaintiff's rheumatoid arthritis was fairly well controlled due to her medication. While

Dr. Blanchard indicated plaintiff's mental health conditions contributed to her inability to work,

"there [was] no mention that he has referred you to Behavioral Health care provider which we would

expect if this was an impairing condition." [Id. at 424]

Unum additionally set forth the following pertinent provisions of the long term disability

policy:

*HOW DOES UNUM DEFINE DISABILITY?*

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties[3] of
  your regular occupation[4] due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the
  same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that
due to the same sickness or injury, you are unable to perform the duties of
any gainful occupation for which you are reasonably fitted by education,
training or experience.

[Id. at 425 (emphasis omitted)] The letter concluded by providing instructions on how to appeal

Unum's decision, and stated if plaintiff disagreed with the determination on appeal, she could file

a civil action. [Id. at 425-26]

---

[3]The policy defines "material and substantial duties" as "duties that . . . are normally required for
the performance of your regular occupation; and . . . cannot be reasonably omitted or modified." [Doc.
12, pp. 110, 425]

[4]"Regular occupation" is defined as: "[T]he occupation you are routinely performing when your
disability begins. Unum will look at your occupation as it is normally performed in the national economy,
instead of how the work tasks are performed for a specific employer or at a specific location." [Doc. 12,
pp. 112, 425]

On June 30, 2014, counsel for plaintiff sent correspondence to Unum requesting an appeal. [Id. at 445] On appeal, Unum had plaintiff's entire file, including additional information provided by her counsel, reviewed by a third physician, Dr. Beth Schnars, Board Certified in Internal Medicine. [Id. at 568; Doc. 19, p. 15] Dr. Schnars noted plaintiff's rheumatologic and neurologic examinations were "unremarkable"; there had been no significant adjustment in her medications for rheumatoid arthritis or PND; based on the weight of the medical evidence submitted, there was no physiologic evidence to support ongoing impairment which would preclude work at the full time sedentary level; there were no documentations of adverse medication side effects[5]; plaintiff had no diabetic complications; her blood pressures were within the normal range and there were no cardiac symptoms; there was no historical information in the medical records regarding behavioral issues; there was no diagnosis of dependent edema, nor any reference to bathroom frequency being an issue[6]; and there was no diagnostic imaging submitted of the axial or peripheral joints to demonstrate advanced degenerative processes. [Id. at 566-67] Dr. Schnars concluded, "in consideration individually and collectively of Ms. Bellard's general medical diagnoses (rheumatoid arthritis, PKD, diabetes, hypertension, dependent edema and BH issues) the medical records do not support ongoing impairment." [Id. at 568] She additionally concluded Dr. Blanchard's opinion of ongoing impairment was not supported by the submitted medical records. [Id.]

## II.    Standard of Review

The parties stipulate: "The Employee Welfare Benefit Plan at issue is governed by the Employee Retirement Income Security Act of 1974 ("ERISA")." [Doc. 8] "ERISA provides federal

---

[5]Dr. Schnars noted plaintiff reported mild nausea to her neurologist with the initiation of her PND medication. However, the nausea subsequently improved. [Doc. 12, pp. 567-68]

[6]Dr. Schnars further noted plaintiff was taking Lasix prior to the date of disability and was able to work. [Doc. 12, p. 567]

courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators."
*Estate of Bratton v. National Union Fire Ins. of Pittsburgh, PA*, 215 F.3d 516, 520-21 (5th Cir.
2000)(citing 29 U.S.C. § 1132(a)(1)(B)). In this matter, all parties agree the benefit plan gives the
administrator discretionary authority to determine eligibility for benefits and to construe the terms
of the plan. [Doc. 9; Doc. 13] Accordingly, the Court reviews the underlying decision for abuse of
discretion.[7] *Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009).

"A plan administrator abuses its discretion where the decision is not based on evidence, even
if disputable, that clearly supports the basis for its denial."[8] *Singletary v. United Parcel Service,
Incorporated*, 828 F.3d 342, 347 (5th Cir. 2016)(quoting *Holland* at 246). Abuse of discretion "is the
functional equivalent of arbitrary and capricious review" in the ERISA benefits review context.
*Anderson v. Cytec Industries, Inc.*, 619 F.3d 505, 512 (5th Cir. 2010). "A decision is arbitrary only
if made without a rational connection between the known facts and the decision or between the
found facts and the evidence." *Holland* at 246 (quoting *Meditrust Fin. Servs. Corp. v. Sterling
Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999)).

---

[7]If the plan did not give the administrator discretionary authority, review would be de novo.
*Estate of Bratton* at 521.

[8]Typically, a two-step process is used when determining whether a plan administrator abused its
discretion. *Holland* at 246, n. 2. First, the court determines whether the administrator's interpretation was
legally correct. *Holland* at 246, n. 2; *Singletary* at 347. If the administrator's interpretation was legally
correct, no abuse of discretion occurred and the inquiry ends. *Pylant v. Hartford Life and Acc. Ins. Co.*,
497 F.3d 536, 540 (5th Cir. 2007). If the court concludes the administrator did not give the plan the
legally correct interpretation, the court must determine whether the administrator's interpretation
constitutes an abuse of discretion. *Id.* Nonetheless, courts "are not confined to this test" and may "skip
the first step if [they] can more readily determine that the decision was not an abuse of discretion."
*Holland* at 246, n. 2. The parties in this case have not conformed their arguments to the Fifth Circuit's
traditional two-step analysis, and instead focus solely upon whether the Plan Administrator abused his
discretion. Accordingly, the Court pretermits discussion of whether the Plan Administrator's denial was
legally correct, reviewing only whether the Plan Administrator abused its discretion in denying the claim.
*Id.*; *Porter v. Lowe's Companies, Inc.'s Business Travel Acc. Ins. Plan*, 731 F.3d 360, 364 (5th Cir. 2013).

"In addition to not being arbitrary and capricious, the plan administrator's decision to deny benefits must be supported by substantial evidence." *Anderson v. Cytec Indus.*, 619 F.3d 505, 512 (5th Cir. 2010). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)). Ultimately, a court's "review of the administrator's decision need not be particularly complex or technical," as the court must only ensure that the decision falls "somewhere on a continuum of reasonableness–even if on the low end." *Id.* (quoting *Corry* at 398).

Finally, courts must consider the conflict of interest inherent in a benefits system in which the entity that pays the benefits - here, Unum - also exercises discretionary control over the ultimate benefits decision. *Id.* The court "weighs the structural conflict as one of the many factors relevant to the benefits determination decision." *Id.* In this matter, plaintiff has made no argument that Unum's conflict of interest influenced its benefits decision. Accordingly, the Court agrees with Unum that any conflict of interest is not a significant factor. *Id.*; *Holland* at 249.

## III.     Analysis

Plaintiff argues Unum misinterprets the policy in two ways: "First, UNUM never seriously takes into account the vocational impediments caused by Plaintiff's profound medical maladies. . . . Second, UNUM simply argues, without support, its opposition to the facts and opinions posited by Ms. Bellard's long-standing internist, while acknowledging that no physician had ever evaluated Ms. Bellard on UNUM's behalf." [Doc. 17, p. 3]

As to plaintiff's first argument, plaintiff contends, "UNUM knew that Ms. Bellard could not [sic] longer drive, that she continued to have seizure activity, and that Ms. Bellard could not take her medication while working - especially her fluid pill or her pain medication." [Doc. 17, p. 4] Plaintiff

additionally asserts Unum failed to "take into account the depression medication, [and] the narcotic pain medication required to control various chronic pain issues." [Id. at 5-6] According to plaintiff, Unum should have had her evaluated by "independent specialists" and/or had her undergo a functional capacity evaluation before denying her claim. [Id. at 6]

With regard to plaintiff's assertion she is no longer able to drive, Dr. Leverett noted driving is not material to plaintiff's occupational duties. He further noted plaintiff's neurologist had not restricted her from driving. Dr. Bress similarly observed no physician other than Dr. Blanchard had mentioned any driving restrictions. Unum contends even if it were true that plaintiff could not drive to work (which Unum denies), "it would not be unreasonable for Unum to assume that she could find ways to arrive at work other than by driving herself."[9] [Doc. 19, p. 25]

With regard to "seizure activity," Dr. Bress observed that no seizure activity had been reported since plaintiff began the medication prescribed by Dr. Foreman. Dr. Schnars noted PND is usually responsive to anticoagulant medication, there had been no significant adjustments to

---

[9]Unum cites *Gomez v. Monsanto Co. Disability Plan through Monsanto Co. Employee Benefits Plan Committee*, 2009 WL 961373 (E.D.La) in support of this argument. In *Gomez*, Judge Africk stated as follows:

> [A]ny restrictions on plaintiff's ability to drive do not translate into an inability to work and [the administrator's] decision to discontinue benefits despite this limitation is not arbitrary and capricious. *See Nelson v. Unum Life Ins. Co.*, 421 F.Supp.2d 558, 568 (E.D.N.Y.2006) ("It is clear that a claimant's commute to a particular job site is not a consideration for determining disability."); *Graham v. First Reliance Standard Life Ins. Co.*, No. 04–9797, 2007 WL 2192399, at *7 (July 31, 2007 S.D.N.Y..); *Adams v. Prudential Ins. Co.*, 280 F.Supp.2d 731, 739–40 (N.D.Ohio 2003)("The Court is unpersuaded by [plaintiff's] argument that his inability to travel to and from work is a material and substantial duty that Defendant must consider."); *Chandler v. Underwriters Lab, Inc.*, 850 F.Supp. 728, 738 (N.D.Ill.1994); *Ross v. Prudential Ins. Co.*, No. 06–133, 2007 WL 581672 (E.D.Ky. Feb.20, 2007)(finding that an administrator's denial of benefits to an employee who suffered seizures was not arbitrary and capricious despite physicians' restrictions against driving).

*Gomez* at *9 (footnotes omitted).

plaintiff's PND medication, and her neurological examinations were unremarkable. Dr. Leverett noted plaintiff had no episodes of dystonia since beginning her medication regimen, and she reported no significant adverse side effects from the PND medication.

As to plaintiff's assertion she could not take her medications while working (*i.e.* her fluid pill, pain medication, and depression medication), Dr. Leverett observed the medical records contained no reports of incontinence associated with diuretic use, and no reported adverse medication effects. Dr. Bress noted there were no urinary problems documented in the records, and no reports of adverse side effects from pain medication. Dr. Schnars noted the records contained no reference to adverse medication side effects, no diagnosis of dependent edema, and no reference to bathroom frequency being an issue despite the fact plaintiff was taking Lasix prior to the date of disability. Plaintiff has not made any argument as to how her depression medication affected her ability to work.

As to plaintiff's assertion Unum should have had her evaluated by "independent specialists" and/or had her undergo a functional capacity evaluation before denying her claim, that argument is without merit. *Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 308, n. 3 (5th Cir. 2015)("ERISA does not mandate an independent medical examination prior to a denial."); *Holland* at 250 ("ERISA does not require a Plan Administrator to seek consultation of a vocational expert"); *Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 335 (5th Cir. 2001)(No abuse of discretion where plan administrator had independent physician conduct a file review rather than a physical examination.); *accord Gothard v. Metropolitan Life Ins. Co.*, 491 F.3d 246, 249 & n. 7 (5th Cir. 2007). The Court notes Dr. Leverett concluded an FCE was unnecessary and set forth his reasoning for same. [Doc. 12, pp. 433-34] Additionally, on March 13, 2014, Unum sent plaintiff correspondence advising her, "it is your right, or the right of your attending physician, . . . to request

an 'independent medical examination' (IME) should opinions differ on the degree of medical impairment." [Id. at 174] If plaintiff believed further evaluation was warranted, she could have supplemented the record with same. The policy in this matter places the burden on the claimant (not the Plan Administrator) to provide proof of loss showing "the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation." [Doc. 12, p. 86]

As to plaintiff's second argument, plaintiff contends Unum did not "take into account the facts and medical judgment of Dr. Blanchard, Ms. Bellard's internist for fifteen (15) years, when he delivered the opinion that he did not think she would ever be able to refer [sic] to the workforce in any capacity." [Doc. 17, p. 5] According to plaintiff, Unum abused its discretion by not adopting the conclusions of her treating physician without having a physician physically examine plaintiff on Unum's behalf.

Unum notes the attending physician statement executed by Dr. Blanchard on September 11, 2013 listed the conditions that prevented plaintiff from working as "TIA, Rheumatoid Arthritis and Diabetes Mellitus." However, the following October, plaintiff was evaluated by a neurologist, Dr. Foreman, who ruled out both TIA and seizures and diagnosed plaintiff with PND, which was successfully treated with medication. [Doc. 19, p. 22] All records indicated plaintiff's diabetes and rheumatoid arthritis were well-controlled with medication. Three different physicians reviewed plaintiff's file on behalf of Unum, and all concluded "Dr. Blanchard's conclusory opinions are unsupported by the record." [Id.]

As set forth above, ERISA does not require a plan administrator to have an independent doctor perform a physical examination. *Gooden* at 335; *Gothard* at 248 & n. 7. Additionally, ERISA does not require plan administrators to "accord special deference to the opinions of treating

physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). "Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.* It is clear from the administrative record in this matter that Unum considered all of the medical information submitted by plaintiff's treating physicians. The record contains substantial evidence from which Unum could have found plaintiff was not disabled under the terms of the Plan. Unum did not abuse its discretion and, accordingly, the Court will not disturb its determination.

For the reasons set forth herein, Unum's decision to deny plaintiff's claim for long term disability benefits is AFFIRMED.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this 5th day of December, 2016.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE